**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Piper Sandler & Co.,                          Case No.  0:23-CV-2281

               Plaintiff,

      v.                                          **MEMORANDUM IN SUPPORT OF**
                                   **PLAINTIFF'S MOTION FOR A**
Constanza Gonzalez,                          **TEMPORARY RESTRAINING**
                                   **ORDER AND PRELIMINARY**
              Defendant.                    **INJUNCTION**

## INTRODUCTION

Defendant Constanza "Connie" Gonzalez ("Gonzalez"), a former employee of Plaintiff Piper Sandler & Co. ("Piper"), has breached and continues to breach her restrictive covenants with Piper. Gonzalez misappropriated Piper's highly confidential information on the eve of leaving Piper to go to work for a competitor, D.A. Davidson Companies ("Davidson"). Subsequent to her departure from Piper, Gonzalez has solicited Piper clients and appears to have used the stolen information to Piper's disadvantage. Piper has and will continue to be irreparably harmed by Gonzalez's actions. Piper has filed this action to immediately restrain and enjoin Gonzalez.

When Gonzalez began at Piper, she signed an Offer Letter that included confidentiality and non-solicitation provisions. In short, the Offer Letter prohibits

Gonzalez from copying, disclosing, or using Piper's confidential information unless it is for the benefit of Piper, and, for 90 days following the termination of her employment, from soliciting Piper's clients, including prospective clients, with whom Gonzalez had been in contact in the preceding 12 months of her employment with Piper.

Gonzalez has violated her agreement with Piper. A recent forensic analysis of Gonzalez's devices shows that in the weeks leading up to her resignation Gonzalez began reviewing highly confidential Piper files, including all active transaction files, new market transactions, and administrative files such as business plans, forecasts, and client lists. Many of these files were outside the scope of her job duties. Then, on the Saturday before her resignation—with the office closed—Gonzalez accessed, modified, and printed numerous, highly sensitive files. Gonzalez had the highly confidential information in her possession when she joined Davidson. Put simply, Gonzalez stole Piper's confidential information.

To make matters worse, immediately upon joining Davidson, Gonzalez began using Piper's confidential information to solicit Piper's potential and existing clients. After Gonzalez joined Davidson, people contacted Piper inquiring as to why Gonzalez was now contacting them through Davidson. During these discussions, Piper learned that Davidson had access to Piper's

confidential information. Davidson was using Piper's information, including confidential financing models, to compete against Piper.

After discovering this misconduct, Piper attempted to redress the situation with Davidson. In response to Piper raising its concerns, Davidson and Gonzalez confirmed that Gonzalez stole Piper's confidential information but claimed that Gonzalez had since deleted the confidential information and further claimed that she had never used the information or solicited Piper's clients. Their promises ring hollow. After Gonzalez claimed to have deleted the information and to have not solicited Piper's clients, Piper received written confirmation that Gonzalez was still working with a prospective Piper client while at Davidson.

An immediate TRO and preliminary injunction are necessary to protect Piper's interests. Once the Court decides Piper's motion for a temporary restraining order (TRO) and preliminary injunction, the case will move to Financial Industry Regulatory Authority ("FINRA") arbitration. Piper merely asks the Court to preserve the status quo by enforcing the parties' contracts until a FINRA panel decides whether to grant a permanent injunction. The Court should grant Piper's motion.

## FACTUAL BACKGROUND

**I.    Piper Sandler is a leading investment bank.**

Piper is a leading investment bank that supports the growth and success of its clients through, among other things, investment banking and public finance. (Declaration of Zachary Bishop ("Bishop Decl.") at ¶ 2.) Due to the nature of the work and the competitiveness of the market, it often takes years before Piper's clients and potential clients may close a transaction. (*Id.*) As a result, Piper spends significant resources researching, tracking, and identifying potential client opportunities. (*Id.*) Once Piper is able to identify a client or transaction, then, typically, Piper's clients negotiate and enter into engagement agreements with Piper in which Piper agrees to assist the clients with the sale of debt in exchange for a fee. (*Id.*) This process can often take months if not years to complete. (*Id.*) In addition, clients are not required to close the transaction which means Piper may invest significant resources over months or years on behalf of its clients without compensation. (*Id.*) Put simply, Piper spends significant time, resources, and investments in identifying potential projects and building relationships with clients and prospective clients.  As a result, Piper reasonably protects those relationships with clients and prospective clients and the extremely valuable documents which summarize Piper's efforts in part by using restrictive covenants with employees.

Piper is headquartered in Minneapolis, Minnesota, but it operates across the world. (*Id.* ¶ 3.) Relevant here, Piper has a Utah office located in Salt Lake City. Similar to its other locations, Piper's Utah office offers, among other things, investment banking and public finance services to its clients. (*Id.*)

## II.   Gonzalez worked for Piper from January 2022 to June 2023.

### A.   When Gonzalez joined Piper, she agreed to reasonable restrictive covenants.

Gonzalez started at Piper as a Public Finance Investment Banking Associate, effective January 3, 2022. (Declaration of William Paterson ("Paterson Decl.") Ex. 1.) Gonzalez's employment offer from Piper was contingent upon her agreeing to the terms stated within her Offer Letter. Gonzalez executed the Offer Letter on December 21, 2021, and thereby agreed to its terms. (*Id.*)

Along with detailing her compensation, including a significant salary and signing bonus, the Offer Letter contained non-solicitation and confidentiality provisions. Relating to the relevant restrictive covenants, the Offer Letter states:

> <u>Non-Solicitation of Clients</u>
> For ninety days following the termination of your employment for any reason, you agree that you will not directly or indirectly, solicit or assist in the solicitation of Piper Sandler's investment banking or capital market clients or prospective clients with whom you have had any contact in the twelve months preceding the termination of your employment. This provision will apply to any geographic area in which Piper Sandler (i) has engaged in business during your employment with Piper Sandler through deal transactions, merger and acquisition advisory services, marketing or otherwise, or (ii) has otherwise established its goodwill, business reputation or any client relations. You acknowledge and agree that this

non-solicitation agreement is necessary to protect Piper Sandler's legitimate business interests, and that the compensation that Piper Sandler has offered to you in this letter is sufficient consideration for this non-solicitation agreement. By signing this letter you voluntarily elect to receive and accept the terms and conditions of this paragraph and acknowledge and agree that they are fair and reasonable under the circumstances.

### Confidential Information and Unfair Competition

You recognize that any knowledge or information of any type whatsoever of a confidential nature relating to the business of Piper Sandler or any of its parents, subsidiaries or affiliates, including, without limitation, all types of trade secrets, client lists or information, employee list or information, information regarding product development, marketing plans, management organization information, operating policies or manuals, performance results, business plans, financial records, or other financial, commercial, business or technical information (collectively, "Confidential Information"), must be protected as confidential, not copied, disclosed or used other than for the benefit of the Company at any time, unless and until such knowledge or information of the Company that became or becomes a matter of public record through no fault, act or omission of yours, or information developed by and/or already in your possession without confidentiality restrictions. You further agree not to divulge to anyone (other than the Company or any of its affiliates or any persons employed or designated by such entities), publish or make use of any such Confidential Information without the prior written consent of the Company . . . . You further agree that all such information, documents and records are and shall at all times remain the sole and exclusive property of Piper Sandler and at the cessation of your employment you shall not retain and shall return to the Company any tangible property, documents or like material assigned to you by the Company or prepared by you during your employment including all copies thereof. You acknowledge that your failure to comply with the provisions set forth herein would constitute unfair competition.

(Paterson Decl. Ex. 1.)

In addition to agreeing to the restrictive covenants above, Gonzalez agreed that the restrictive covenants were reasonable and agreed to in exchange for valuable consideration:

> You acknowledge and agree that the covenants and obligations with respect to the provisions titled Non-Solicitation of Clients, Non-Solicitation of Employees, Confidential Information and Unfair Competition (collectively, the "Restrictive Covenants") relate to special, unique and extraordinary services rendered by you to the Company and that the Company has provided valuable consideration to you in exchange for your agreement to be bound by the Restrictive Covenants.

(*Id.*)

Finally, in the Offer Letter, Gonzalez agreed that any violation of the restrictive covenants would cause Piper irreparable harm and therefore entitle Piper to injunctive relief:

> You further acknowledge and agree that a violation of any of the material terms of the Restrictive Covenants by you will cause the Company to suffer irreparable injury for which adequate remedies are not available at law and damages would be difficult to ascertain and speculative. Therefore, if you violate or threaten to violate any of the material terms of the Restrictive Covenants you agree that the Company shall be entitled to an injunction, restraining order or such other equitable relief (without the requirement to post bond) restraining you from committing any violation of the Restrictive Covenants.

(*Id.*)

## B.   Gonzalez was placed on an employee improvement plan after struggling to perform her job duties.

As an Associate at Piper, Gonzalez's job responsibilities included business development, researching potential projects and clients, summarizing financing

models for client projects, meeting with clients and prospective clients, and participating in Piper's internal strategy meetings. Gonzalez had significant exposure to Piper's clients and prospective clients, including prospective clients in other markets. (Bishop Decl. at ¶ 4.)

After working at Piper for several months, it became clear that Gonzalez was failing to adequately perform her job duties. (*Id.* at ¶ 5.) Gonzalez routinely failed to soundly analyze data in financial modeling, made errors in client deliverables that hurt Piper's brand and credibility, and displayed a lack of emotional self-regulation that negatively impacted her team. (*Id.*)

In March 2023, Gonzalez was placed on an employee performance plan. (*Id.* at ¶ 6.) As part of the employee performance plan, Gonzalez's superiors met with her to discuss various areas for improvement. Despite receiving constructive feedback, Gonzalez never seemed to improve her performance. Separately, Gonzalez boasted to Piper employees about being recruited by Davidson. (*Id.*)

Gonzalez resigned from Piper on June 22, 2023. (*Id.* at ¶ 7.) Upon information and belief, Gonzalez began working for Davidson a few days later on June 26, 2023. (Declaration of Benjamin Becker ("Becker Decl.") at ¶ 9; *see also* Paterson Decl. Ex. 4 (Gonzalez's FINRA BrokerCheck showing Gonzalez became registered with Davidson on June 26, 2023).)

III.    **For years, Davidson—a competitor of Piper—has recruited Piper's employees and clients.**

Davidson is a competitor of Piper. (Becker Decl. at ¶ 2.) Davidson offers similar services to clients, and similar to Piper, has an office in Salt Lake City, Utah. Piper and Davidson are the two biggest players in the Utah special district public finance market.  (*Id.*)

Over the last few years, Davidson's Utah office has actively recruited employees and clients from Piper's Utah office. (*Id.*) Davidson uses disparaging comments regarding Piper in order to recruit potential and current Piper employees and clients. (Becker Decl. at ¶¶ 3-6.) As a result of these disparaging and misleading comments, Piper has been forced to mend relationships with its clients and otherwise defend its reputation in the market.

Piper believes that Davidson used its improper tactics to recruit Gonzalez to leave Piper.

IV.    **In preparing to leave Piper, Gonzalez began accessing confidential files outside the scope of her role.**

Unbeknownst to Piper, Gonzalez submitted an employment application to Davidson on June 13, 2023.[1] (Declaration of Mark Lanterman ("Lanterman

_____

[1] Consistent with Piper's employment policies, after Gonzalez left Piper, Piper conducted a forensic review of Gonzalez's Piper laptop. This preliminary review showed, among other things, that Gonzalez applied to Davidson on June 13, 2023

Decl.") at ¶ 18(b).) Gonzalez told Piper she was on vacation from June 13

through June 16, but Gonzalez told three different stories to three different Piper

employees as to her vacation plans. (Becker Decl. at ¶ 7.) In reality, during her

purported "vacation," Gonzalez visited Davidson's office, strategically accessed

and reviewed Piper's confidential files, and then printed those files on a

Saturday when Piper's office was closed (Lanterman Decl. at ¶¶ 32, 34-35.)

Specifically, on June 15 and 16, Gonzalez accessed Piper's confidential

database. (Lanterman Decl. at ¶ 35.) She reviewed specific files, including

business development tracking summaries, client presentations, and specific

financial modeling plans including plans for projects and clients for which

Gonzalez had no involvement. (Lanterman Decl. At ¶ 35; Becker Decl. At ¶ 8;

Bishop Decl. At ¶¶ 8-10.) The files Gonzalez viewed on June 16 are extremely

valuable to Piper. (Becker Decl. At ¶ 8; Bishop Decl. At ¶¶ 8-10.) For example, the

business development tracking summary was developed through proprietary

data analysis across multiple markets, which provides the blueprint for pursuing

Piper clients in those markets. (Bishop Decl. At ¶ 8.) The files Gonzalez

accessed—and later stole—also included detailed project and revenue pipelines

for all active deals across all markets. (*Id.*) The files are confidential pursuant to

---

from her Piper laptop, and that Gonzalez accessed, printed, and modified Piper's
confidential information on the eve of leaving Piper to join Davidson.

the Offer Letter. (*Id.*) Many of the files she viewed are outside the scope of her normal job duties. (*Id.*)

The next day, Saturday, June 17—with the office closed—Gonzalez went to the office and printed the same highly confidential documents she had reviewed the day before. (Lanterman Decl. at ¶ 36-41 and Ex. C.) In an apparent effort to either cause further harm to Piper or cover her tracks, after printing the confidential documents, Gonzalez changed the name of over a thousand Piper files. (Lanterman Decl. at ¶ 46-47.)

Gonzalez stole the highly confidential documents from Piper and had them in her possession at the time she began her employment with Davidson. (Paterson Decl. Ex. 3.) Piper was unaware of Gonzalez's transgressions until after she joined Davidson.

On Thursday, June 22, 2023, Gonzalez resigned from Piper. (Bishop Decl. At ¶ 7.)

## V.   Gonzalez joined Davidson and, with Davidson's assistance, immediately put Piper's confidential information to use.

Gonzalez's employment at Davidson began on or about Monday, June 26, 2023. (Becker Decl. At ¶ 9; Paterson Decl. Ex. 4.) Immediately after starting at Davidson, Gonzalez began soliciting Piper's clients. (*Id.* at ¶¶ 9-13.) In the 12 months preceding her resignation from Piper, Gonzalez had been in contact with the Piper clients that she was soliciting for Davidson. (*Id.* at ¶¶ 10-13.)

Gonzalez approached and solicited Piper's clients over the phone and in person. For example, on June 26, 2023—believed to be Gonzalez's first day at Davidson—Gonzalez and another Davidson employee contacted Piper's deal attorney from Davidson's office. The attorney contacted Piper to let Piper know that they had participated in a call with Gonzalez, who was at Davidson's office. (*Id.* at ¶ 9.)

Gonzalez also approached Piper clients at networking events. For example, on June 27, 2023, at a networking event, Gonzalez introduced herself to attendees as a Davidson employee. At the event, Gonzalez approached at least one Piper client and expressed her desire that the client work with Davidson. (*Id.* at ¶ 11.)

When soliciting Piper's clients, it appears as though Gonzalez used the highly confidential information she had stolen from Piper. For example, one prospective client informed Piper that Davidson had Piper's information, including financing models that Piper had prepared for the specific client. (*Id.* at ¶¶ 10, 12.) When Gonzalez and Davidson were soliciting Piper's clients, they were comparing Davidson's financing plan to Piper's and trying to convince the client that Davidson's plan was better. (*Id.*)

As a result of Gonzalez's solicitation efforts, Piper lost a potential client to Davidson. Piper expected that the client/project would produce close to $1 million for Piper. (*Id.* at ¶ 12.) Piper was also forced to regain a different client

that it had been working with before Gonzalez left Piper to join Davidson. Due to the nature of the information Gonzalez stole, it is likely that this client impact is only the tip of the iceberg in the Utah and Colorado markets.

**VI.    Piper attempted to resolve Defendants' wrongdoing, to no avail.**

Immediately after Gonzalez resigned, and consistent with Piper's policies, Piper conducted an internal forensic review of the devices that Gonzalez had used at Piper. (Paterson Decl. Ex. 2; *see generally* Lanterman Decl.) The internal review showed Gonzalez's misconduct in the days leading up to her resignation.

After learning that Gonzalez had stolen its information when preparing to leave Piper to join Davidson, Piper immediately contacted Davidson to inform Davidson of the serious misconduct. (Paterson Decl. Ex. 2.) After Piper contacted Davidson, Gonzalez signed an attestation claiming that she had deleted the confidential documents she had stolen from Piper. (*Id.* Ex. 3.) Gonzalez also claimed that she never used the information and never solicited Piper's clients. (*Id.*)

Piper asked Davidson to obtain from Gonzalez the password to the mobile phone issued by Piper to Gonzalez which was returned to Piper when Gonzalez resigned. (*Id.* at ¶ 5.) Gonzalez, through counsel for Davidson, purportedly provided passcodes for Gonzalez's mobile phone. The passwords provided by Davidson and Gonzalez were incorrect passcodes. (*Id.*; Lanterman Decl. ¶ 14.)

13

It does not appear that Davidson took any disciplinary action against its employee, Gonzalez, for her clear violation of her contracts with Piper and her misappropriation of Piper's confidential information. Instead of disciplining Gonzalez for her theft, Davidson lauded Gonzalez's hiring and touted her hiring to the marketplace. (Paterson Decl. at ¶ 7.)

After bringing these issues to Davidson and Gonzalez's attention, Piper continued to receive evidence demonstrating Gonzalez's continued violations of the restrictive covenants. For example, on July 21, 2023, Piper received an email from a client directed to Gonzalez and another Davidson employee. (Becker Decl. at ¶ 13; Ex. 1.) Piper received the email because the client appears to have mistakenly emailed Gonzalez at her Piper email address rather than her new Davidson email address. The client was sending files to Gonzalez in response to a request from Gonzalez. Gonzalez had been in contact with this client when she worked for Piper. (*Id.*)

Gonzalez and Davidson continue to benefit from Piper's highly confidential information and Gonzalez's improper solicitation of Piper's clients. Because Gonzalez violated her restrictive covenants and continues to do so, Piper is forced to bring this action to protect its rights. Piper has and will continue to suffer irreparable injury as a result of Defendant's actions. Piper now asks the Court to order temporary injunctive relief to prevent irreparable injury.

## ARGUMENT

**I.   THE COURT SHOULD ENTER A TEMPORARY RESTRAINING ORDER AGAINST DEFENDANT, FOLLOWED BY A PRELIMINARY INJUNCTION**

The Court should enter a TRO, followed by a preliminary injunction:

1.   Enjoining Defendant Connie Gonzalez, for 90 days from the date of the Court's Order, from soliciting any Piper client or potential client with whom Gonzalez had contact within the last 12 months of her employment at Piper;

2.   Enjoining Gonzalez from disclosing, using or misappropriating any confidential information of Piper Sandler & Co.; and

3.   Enjoining Gonzalez to provide, unaltered, all devices she has used from the start of her employment with Piper on January 3, 2022 to the present so that Piper may have an independent forensic examiner review the devices and, if necessary, scrub the devices of all Piper information.

The Court has the power to enter this relief even though the parties' dispute will ultimately be arbitrated in FINRA. FINRA Rule 13804(a) expressly states that, "[i]n industry . . . disputes required to be submitted to arbitration under the Code, parties may seek a temporary injunctive order from a Court of competent jurisdiction."[2] The Offer Letter also entitles Piper to obtain preliminary injunctive relief from a court in Minnesota before proceeding to

---

[2] As FINRA Rule 13804(a) requires, Piper is filing a claim in FINRA at the same time it is moving for temporary injunctive relief. If the Court grants Piper's motion for a TRO and preliminary injunction, then the parties will proceed to FINRA arbitration to resolve Piper's arbitration claim for, among other things, a permanent injunction.

arbitration. Paterson Decl. Ex. 1; *see also* Minn. Stat. § 572B.08 (allowing a court to "enter an order for provisional remedies to protect the effectiveness of the arbitration proceeding" before an arbitrator is appointed); *Interstate Power Sys., Inc. v. Gen. Elec. Co.*, 2011 WL 5025275, *2-4 (D. Minn. Oct. 21, 2011) (compelling arbitration and entering a preliminary injunction pending arbitration).

The purpose of temporary injunctive relief is to preserve the status quo until there is a final hearing for permanent relief. *See Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 490 (8th Cir. 1993). In deciding whether to issue a TRO or preliminary injunction, the Court must balance the following four factors:

(1)     irreparable harm to the plaintiff if the injunction is denied;

(2)     the harm to the defendant if the injunction is entered;

(3)     the likelihood the plaintiff will succeed on the merits of its claims; and

(4)     the public interest in the dispute.

*Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981); *see also Jackson v. Nat'l Football League*, 802 F. Supp. 226, 229 (D. Minn. 1992) (applying the same factors to a TRO).[3] All of the *Dataphase* factors weigh in favor of enjoining Defendant from violating her contract with Piper.

---

[3] In this case, the law of the forum (federal law) governs the standards for granting injunctive relief, and state law governs the substantive merits of Piper's

### A.      Piper Will Suffer Irreparable Harm Absent an Injunction

The first *Dataphase* factor – irreparable harm – supports the TRO and preliminary injunction Piper seeks. In federal court, the basis for temporary injunctive relief is irreparable harm and inadequacy of legal remedies. *Planned Parenthood Minn., et al v. Rounds*, 530 F.3d 724, 732, n.5 (8th Cir. 2008). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009).

Minnesota federal and state courts infer that a company is irreparably harmed when a former employee breaches their non-solicitation or confidentiality agreement. *See St. Jude Med., Inc. v. Carter*, 913 N.W.2d 678, 685 (Minn. 2018) ("Yet there are circumstances in which it may be appropriate for a district court to infer irreparable harm. We have recognized that these circumstances include situations where customer good will is at stake, when an employee takes business secrets with an intent to benefit from the secrets, or when a risk exists that the secrets will be disclosed in the subsequent employment and result in irreparable damage."); *Gibbons*, 527 F. Supp. at 1091; *Thermorama, Inc. v. Buckwold*, 125 N.W.2d 844, 845 (Minn. 1964); *Medtronic, Inc. v.*

---

claims.  *Medtronic, Inc. v. Gibbons*, 527 F. Supp. 1085, 1090 (D. Minn. 1981), *aff'd,* 684 F.2d 565 (8th Cir. 1982).

*Advanced Bionics Corp.*, 630 N.W.2d 438, 452 (Minn. Ct. App. 2001); *Liberte Const., LLC v. Zaabri*, 2017 WL 9438456, at *7 (Minn. Dist. Ct. Oct. 26, 2017) (granting preliminary injunction due to violations of non-solicitation and confidentiality provisions). Indeed, breach of a restrictive covenant is grounds for finding irreparable harm. *See Cherne Indus., Inc. v. Grounds & Assocs.*, Inc., 278 N.W.2d 81, 95 (Minn. 1979) ("In general, a plaintiff who successfully establishes that the defendant has breached an employment contract or has wrongfully taken and used trade secrets or confidential information may obtain both injunctive relief and damages.").

In considering the irreparable harm to the employer, courts focus on the employer's legitimate interests in enforcing the restrictive covenants. "Legitimate interests that may be protected include the company's goodwill, trade secrets, and confidential information." *Medtronic, Inc. v. Advanced Bionics Corp.*, 630 N.W.2d 438, 456 (Minn. Ct. App. 2001) (citing *Roth v. Gamble–Skogmo, Inc.*, 532 F. Supp. 1029, 1031 (D. Minn. 1982)).

An employer has a legitimate interest in protecting the goodwill its employees develop with its customers. *Gibbons*, 527 F. Supp. at 1091. Likewise, an employer also has a legitimate interest in protecting its confidential information. *Cherne Indus., Inc. v. Grounds & Assocs, Inc.*, 278 N.W.2d 81, 94 (Minn. 1979). A former employee poses a threat that he or she will irreparably

18

harm their former employer by soliciting clients or using its confidential information to benefit a competitor. *Id.* at 92; *Advanced Bionics Corp.*, 630 N.W.2d at 453 ("[T]he knowledge he gained while working with Medtronic's customers gives him insight into customer preferences, and Advanced Bionics hired him to make use of that insight."); *Creative Comm. Conlts., Inc. v. Gaylord*, 403 N.W.2d 654, 657 (Minn. Ct. App. 1987) ("The trial court did not abuse its discretion by finding irreparable harm in CCC's loss of clients and the threat that Gaylord would disclose confidential information."); *see Equus Computer Sys., Inc. v. N. Computer Sys., Inc.*, 2001 WL 1636487, at *4 (D. Minn. May 4, 2001) ("The mere threat of misappropriation of trade secrets constitutes irreparable harm and warrants injunctive relief.").

Applying these principles here, Piper will be irreparably harmed if Gonzalez continues to breach the restrictive covenants in the Offer Letter. While employed with Piper, Gonzalez had contact with many current and prospective Piper clients, including the clients that Gonzalez has since been soliciting while at Davidson. Gonzalez also had access to Piper's confidential information, including client contact lists and information regarding clients' business interests and needs. (Bishop Decl. at ¶ 4.) The forensic review confirmed that Gonzalez strategically accessed—and printed—some of Piper's most sensitive and valuable documents, including business development tracking summaries, client

presentations, and specific financial modeling plans including plans for projects and clients, on the eve of leaving Piper to join Davidson. (Lanterman Decl. at ¶ 36-41 and Ex. C; Becker Decl. at ¶ 8; Bishop Decl. at ¶¶ 8-10.) It is not just a threat that Gonzalez will solicit Piper's clients or use Piper's confidential information—she already has. And based on her conduct, it is clear that Gonzalez intends to continue soliciting Piper's clients and using Piper's confidential information to Piper's disadvantage. This misconduct will continue to cause irreparable harm to Piper.

On top of the misconduct described above, Gonzalez already agreed that her violations would cause irreparable harm. When she executed the Offer Letter, Gonzalez expressly acknowledged that violating her restrictive covenants would constitute unfair competition and irreparably harm Piper. (Paterson Decl. Ex. 1.) She even agreed that Piper would be entitled to injunctive relief to prevent her from breaching the Agreements. (*Id.*) The Court should enforce the plain terms of the Offer Letter. *See Life Time Fitness, Inc. v. DeCelles*, 854 F. Supp. 2d 690, 695 (D. Minn. 2012) (finding irreparable harm based, in part, on parties' written agreement acknowledging irreparable harm would result from a breach); *Inspecta Homes of Am., Inc. v. Lilley*, 1995 WL 756842, *2 (Minn. Ct. App. Dec. 26, 1995) (same).

### B.     The Balance of Harms Supports Injunctive Relief

The second *Dataphase* factor – balance of harms - also justifies injunctive

relief here. Piper seeks nothing more than to preserve the *status quo ante* by

holding Gonzalez to the terms of the restrictive covenants she agreed to in the

Offer Letter. Prior to Gonzalez breaching her restrictive covenants, she was

prohibited from stealing, using, or disclosing Piper's confidential information

and soliciting Piper's clients for 90 days after termination of her employment.

(Paterson Decl. Ex. 1.) Piper's proposed injunctive relief will restore those

expectations and preserve the status quo prior to her breaches. Enforcing the

agreement is especially fair considering Gonzalez chose to leave Piper and

trigger her post-employment obligations. *Cf. Advanced Bionics Corp.*, 630 N.W.2d

at 453 (rejecting former employee's argument that he would be harmed by an

injunction enforcing non-compete: "Stultz voluntarily left Medtronic's employ,

knowing that future employment may be subject to the noncompete agreement,

thus creating the current situation.").

### C.     Piper's Claim Is Likely to Succeed on the Merits

The third *Dataphase* factor – likelihood the plaintiff will succeed on the

merits of its claims – supports Piper's proposed TRO and preliminary injunction.

To obtain temporary injunctive relief, Piper must show it has a "fair chance of

prevailing" on its claims. *Rounds*, 530 F.3d at 732. Piper does not have to prove it

will "ultimately win." *PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1143 (8th Cir. 2007). The question is not whether Piper has proven a greater than 50 percent likelihood of prevailing in the end. *Id.* The question is whether any of Piper's claims provide "fair ground for litigation." *Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). The likelihood of success on just one claim is sufficient to grant a preliminary injunction. *Life Time Fitness, Inc. v. DeCelles*, 854 F. Supp. 2d at 695. The Court should grant Piper's motion for a TRO and preliminary injunction because Piper is likely to succeed on its claims for breach of contract against Gonzalez.

      1.    <u>The restrictive covenants are enforceable.</u>

The confidentiality and 90-day client non-solicitation provisions in the Offer Letter are enforceable. Generally, under Minnesota law[4] employee restrictive covenants are enforceable "if they serve a legitimate employer interest and are not broader than necessary to protect this interest." *Kallok v. Medtronic,*

---

[4] Pursuant to the Offer Letter, the restrictive covenants—and Gonzalez's breaches of the restrictive covenants—are governed by Minnesota law. (Paterson Aff. Ex. 1 ("This Offer Letter shall be subject to, governed by and interpreted in accordance with, the laws of the State of Minnesota without regard to conflicts of law principles.").) For the sake of completeness, Piper notes that the restrictive covenants are enforceable under Utah law as well. *See* Utah Code § 34-51-201 (stating that post-employment restrictive covenants for a period of one year or less are enforceable); *see, e.g.*, *Daynight, LLC v. Mobi-Light, Inc.*, 2008 WL 8578664 (Utah Dist. Ct. Sep. 16, 2008).

*Inc.*, 573 N.W.2d 356, 361 (Minn. 1998). Both confidentiality and client non-

solicitation provisions are routinely enforced. See *Larx Co. v. Nicol*, 28 N.W.2d

705, 711 (Minn. 1946) (finding that the "majority of courts" recognize the validity

of confidentiality agreements "even though such agreements be unlimited as to

time and space"); *see, e.g.*, *Dynamic Air, Inc. v. Bloch*, 502 N.W.2d 796, 800 (Minn.

Ct. App. 1993) (finding client non-solicitation provision enforceable).

> The client non-solicitation provision here states, in relevant part:

> For ninety days following the termination of your employment for any
> reason, you agree that you will not directly or indirectly, solicit or assist in
> the solicitation of Piper Sandler's investment banking or capital market
> clients or prospective clients with whom you have had any contact in the
> twelve months preceding the termination of your employment. This
> provision will apply to any geographic area in which Piper Sandler (i) has
> engaged in business during your employment with Piper Sandler through
> deal transactions, merger and acquisition advisory services, marketing or
> otherwise, or (ii) has otherwise established its goodwill, business
> reputation or any client relations.

(Paterson Decl. Ex. 1.)

> This provision is enforceable as a matter of law. First, the restriction is

limited to only 90 days after the termination of Gonzalez's employment—even if

Gonzalez resigns, which she did. Under Minnesota law, courts routinely enforce

non-solicitation provisions lasting much longer. *See, e.g.*, *Softchoice, Inc. v.

Schmidt*, 763 N.W.2d 660, 670 (Minn. Ct. App. 2009) ("Given the amount of time it

takes to develop a customer relationship, we also hold that the one-year duration

of the non-solicitation period ordered by the district court was not

unreasonable."). Second, the restriction is limited to those clients or prospective clients with whom Gonzalez had contact in 12 months preceding the termination of her employment. In other words, this narrowly tailored restriction only seeks to protect Piper's interests relating to the clients Gonzalez would be most likely to solicit (i.e., the clients with whom she had a relationship). This is reasonable under the law. *See, e.g.*, *Primary Surgical v. Swartout*, 2006 WL 763209, at *3 (D. Minn. Mar. 24, 2006) (enforcing non-solicitation provision and granting preliminary injunction because the covenant only restricted solicitation of customers that the employee had contact with while employed by plaintiff). And third, the geographic scope is limited to areas in which Piper has engaged in business or otherwise established its goodwill during Gonzalez's employment. Again, this is reasonable under the law. *See, e.g.*, *Dynamic Air, Inc. v. Bloch*, 502 N.W.2d 796, 799-800 (Minn. Ct. App. 1993) (holding that "[c]ommon sense suggests that a territorial limitation is often an irrelevant factor for [non-solicitation and confidentiality restrictive covenants]"); *West Publ'g Corp. v. Stanley*, 2004 WL 73590, *10 (D. Minn. Jan. 7, 2004) (finding unlimited geographic scope to be "reasonable in light of the national, and indeed international, nature of internet business").

The client non-solicitation provision here states, in relevant part:

You recognize that any knowledge or information of any type whatsoever of a confidential nature relating to the business of Piper Sandler or any of

its parents, subsidiaries or affiliates, including, without limitation, all types of trade secrets, client lists or information, employee lists or information, information regarding product development, marketing plans, management organization information, operating policies or manuals, performance results, business plans, financial records, or other financial, commercial, business or technical information (collectively, "Confidential Information"), must be protected as confidential, not copied, disclosed or used other than for the benefit of the Company at any time, unless and until such knowledge or information of the Company that became or becomes a matter of public record through no fault, act or omission of yours, or information developed by and/or already in your possession without confidentiality restrictions. You further agree not to divulge to anyone (other than the Company or any of its affiliates or any persons employed or designated by such entities), publish or make use of any such Confidential Information without the prior written consent of the Company . . . . You further agree that all such information, documents and records are and shall at all times remain the sole and exclusive property of Piper Sandler and at the cessation of your employment you shall not retain and shall return to the Company any tangible property, documents or like material assigned to you by the Company or prepared by you during your employment including all copies thereof. You acknowledge that your failure to comply with the provisions set forth herein would constitute unfair competition.

(Paterson Decl. Ex. 1.)

Similar to the client non-solicitation provision, this confidentiality provision is enforceable as a matter of law. Piper operates in a highly competitive market with sophisticated clients and significant projects, financially, at stake. The confidentiality provision reasonably protects Piper's highly sensitive information and understandably prohibits the disclosure or use of the information. *See Larx Co. v. Nicol*, 28 N.W.2d 705, 711 (Minn. 1946) (finding that the "majority of courts" recognize the validity of confidentiality agreements

"even though such agreements be unlimited as to time and space"); *see also Sandstrom v. Douglas Mach. Corp.*, 372 N.W.2d 89, 92 (Minn. Ct. App. 1985) ("[T]he employee classified information agreement was reasonably calculated to protect the interests of the respondent under the Uniform Trade Secrets Act. . .").

### 2. Defendant has breached and is continuing to breach the agreement.

Gonzalez is breaching the restrictive covenants in the Offer Letter. A breach of contract occurs when a party totally or partially fails to perform his or her contractual obligations. *Associated Cinemas of Am. v. World Amusement Co.*, 276 N.W. 7, 10 (Minn. 1937).

It is undisputed that Gonzalez breached the confidentiality provision when she stole Piper's confidential information when leaving Piper. Indeed, Gonzalez admitted to breaching the confidentiality provision by attesting to the fact that she had the documents in her possession when joining Davidson. Immediately upon joining Davidson, Gonzalez also breached the client non-solicitation provision when she solicited Piper clients and prospective clients with whom she had previously contacted. "In general, a plaintiff who successfully establishes that the defendant has breached an employment contract or has wrongfully taken and used trade secrets or confidential information may obtain both injunctive relief and damages." *Cherne Indus., Inc. v. Grounds & Assocs.*, Inc., 278 N.W.2d 81, 95 (Minn. 1979).

**D.    An Injunction is in the Public Interest**

The fourth and final *Dataphase* factor – public policy – favors enforcing the

parties' agreement. *See Hood Packaging Corp.*, 2014 WL 4436105, at *7 ("When

balanced against Hood's need to protect its customer relationships and operating

information, public policy favors enforcement of the Agreement against

Steinwagner."); *Merrill Corp. v. R.R. Donnelley & Sons Co.*, 2008 WL 3162490, *4

(D. Minn. Aug. 1, 2008) ("[P]ublic policy favors enforcing valid noncompete

agreements."). Balancing all of the factors, the Court should enter the TRO and

preliminary injunction Piper requests.

**II.    THE COURT SHOULD NOT REQUIRE AN INJUNCTION BOND**

The Court should not require Piper to post an injunction bond. Rule 65

generally requires the party seeking a temporary restraining order to post

appropriate security before the order may be granted. Fed. R. Civ. P. 65(c).

However, the Court has discretion as to the bond amount and may waive the

bond requirement entirely under appropriate circumstances. *See Little Earth of*

*United Tribes, Inc. v. United States Dept. of HUD*, 584 F. Supp. 1301, 1303 (D. Minn.

1983); *In re Zurn Pex Plumbing Products Liability Litigation*, 2012 WL 5055810, *12

(D. Minn. Oct. 18, 2012) (not requiring a bond); *Allied Professionals, Inc. v.*

*Malcolm*, 2001 WL 1640051, *5 (D. Minn. Nov. 21, 2001) (same); *E.W. Blanch*

*Holdings, Inc. v. Knudson*, 2001 WL 1618165, *6 (D. Minn. May 10, 2001) (same);

*Jaunich v. Minneapolis Grain Exchange*, 1991 WL 349902, *2 (D. Minn. Aug. 13, 1991) (same). Gonzalez agreed in the Offer Letter that, if she breached her restrictive covenants, Piper would be entitled to injunctive relief <u>without</u> having to post a bond. (Paterson Decl. Ex. 1.) The Court should follow the parties' agreement and waive the bond requirement.

## <u>CONCLUSION</u>

A TRO and preliminary injunction enforcing the restrictive covenants in the parties' agreement is necessary to prevent irreparable harm to Piper. The Court should enter a TRO and preliminary injunction pending a decision by the FINRA arbitration panel on Piper's request for a permanent injunction.

**ANTHONY OSTLUND LOUWAGIE DRESSEN & BOYLAN P.A.**

Dated: August 2, 2023          By:   *s/ Joseph W. Anthony*
                                                    Joseph W. Anthony (#0002872)
                                                    janthony@anthonyostlund.com
                                                    Peter J. McElligott (#397578)
                                                    pmcelligott@anthonyostlund.com
                                                    William R. Paterson (#401045)
                                                    wpaterson@anthonyostlund.com
                                                    90 South 7th Street
                                                    3600 Wells Fargo Center
                                                    Minneapolis, MN  55402
                                                    Telephone:  612-349-6969

**ATTORNEYS FOR PLAINTIFF**